**Anibal SOTO, Plaintiff–Appellant,**

v.

**David JOHANSEN, Defendant–Appellee.**

**No. 97–2009.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1998.

Decided March 3, 1998.

Gregory S. Bell (argued), Hasselberg, Rock, Bell & Kuppler, Peoria, IL, for Plaintiff–Appellant.

Karen J, Dimond (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendant–Appellee.

Before RIPPLE, MANION and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

While Anibal Soto was an inmate at the Pontiac (Illinois) Correctional Center, he refused to pay "cell rent" to certain inmate/gang members, who did not take his refusal lightly. After he was assaulted for his failure to pay up, Soto filed an action under 42 U.S.C. § 1983, claiming that six prison employees did not adequately protect him. After two defendants were dropped from the suit the case proceeded to a bench trial against the other four, and Soto lost. He appeals the decision only as to one of the defendants; thus it becomes our turn to look at whether Lieutenant David Johansen was deliberately indifferent to Soto's safety in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

When he first arrived at Pontiac in January 1992, Soto was assigned to gallery 5 at the south cellhouse. In February he was accepted into the prison's vocational school and was transferred to gallery 7, the place where vocational students were housed. After arriving at gallery 7, he says several inmates, all gang members, told him that he had to pay rent for his cell; apparently he had to pay—or else. Soto found himself in a tough position. He did not want to pay rent for a cell; but he wanted to attend vocational school, which meant that he had to stay in gallery 7. At least initially, he did not want to move to a protective custody cell because that would have meant that he would be locked up 23 hours per day, which, among other disadvantages, also eliminated the possibility of attending school.

On March 12 Soto talked with Terry Wade, a prison counselor. Regarding that conversation, Wade wrote in his counseling summary, "At vocational school. States he wants to get out of this cell and nobody has moved him. Doesn't want P.C." On March 16 Soto talked with Wade again. This time he said he was scared and that he wanted protective custody, or P.C. in prison jargon. Wade testified that probably on that same day he told a security person what Soto had told him. Soto, however, remained where he was, and he was assaulted a week later on March 23.

Soto contends that the person Wade talked to was Lieutenant Johansen. The problem for Soto is in establishing that fact and, beyond that, that Johansen, in turn, acted with deliberate indifference in failing to protect Soto. Because this case went to trial, the district judge's findings of fact on these points will not be disturbed unless they are clearly erroneous, *Thornton v. Brown*, 47 F.3d 194 (7th Cir.1995), and his credibility determinations are entitled to particular deference. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Prison officials have a duty to take reasonable steps to ensure the safety of inmates, including to ensure their safety from the violent acts of other inmates. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In order to prove a claim, however, a beaten inmate must carry two high hurdles. Soto here had to establish by a preponderance of the evidence that Johansen knew he faced a "substantial risk of serious harm" and, appreciating the danger, that Johansen failed "to take reasonable measures to abate it." At 847, 114 S.Ct. at 1984. *See also Haley v. Gross*, 86 F.3d 630 (7th Cir.1996). As we pointed out in *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 980, 136 L.Ed.2d 863 (1997), "[m]ere negligence or even gross negligence does not constitute deliberate indifference." *See also Luttrell v. Nickel*, 129 F.3d 933 (7th Cir.1997).

Wade could not say for sure who it was that he told of Soto's plight beyond that it was a security person wearing a white shirt. Soto claims that only three officers at the relevant time were wearing white shirts and that Johansen was one of them. Wade himself said that it very probably was Johansen he talked to. Wade said that he remembered telling the white-shirted officer that Soto wanted to change cells, but he did not recall whether he mentioned the demand for the payment of cell rent. Wade also acknowledged that he did not write up an incident report about Soto's March 16 complaints, even though he ordinarily would write a report about complaints of cell rent demands. This omission contrasts with the

fact that Wade wrote a report regarding another of Soto's requests—that time about a request for new underwear.

On the other hand, Johansen testified that he had never had a conversation with Wade about Soto and that if he had, he would have remembered it. Johansen recalled having a conversation with Soto himself between the time Soto arrived in gallery 7 and the time of the assault. That conversation occurred when Johansen saw Soto sitting by himself in the dining room, looking distressed. Johansen asked Soto if he "was straight"; that is, was he all right. Soto did not respond, and Johansen asked him if he wanted protective custody. Soto indicated that he did not. Soto, according to Johansen, did not mention anything about cell rent during this brief encounter.

Johansen also testified that he receives several requests a day for cell changes for all sorts of reasons: a cell is drafty, a cellmate snores, etc. But, according to Johansen, inmates are not moved simply because they ask to be or because they mention things like cell rent; otherwise, he estimates he would have a dozen requests a day for cell changes.

It is from this contradictory evidence that Judge Mihm in the district court had to determine whether Soto made out a case that Johansen was deliberately indifferent to his safety. Soto's first hurdle is to show that Johansen knew of the risk. To repeat, Wade said he probably told Johansen; Johansen said he did not remember that conversation but that when he talked to Soto personally, Soto did not tell him of any problem. Wade did not make any notation about the second conversation.

The judge, who saw the witnesses, remarked that Wade seemed nervous. The judge was not convinced that Wade was offering truthful testimony when he testified that it very probably was Johansen he talked with. Johansen, on the other hand, the judge found to be credible. These credibility determinations were agonizingly and carefully made, and we see no reason to tamper with them.

Beyond that, the judge was unconvinced that Wade told whomever he talked to enough about the situation to require that person to take action—or more accurately, to show that a failure to act was deliberate indifference as that phrase is used in Eighth Amendment parlance.

Lastly, Soto complains that Judge Mihm required him to establish to a "reasonable certainty" that the guard Wade talked to about Soto's predicament was Johansen. If that were the case, Soto would have been held to a higher standard of proof than the appropriate one, which is a preponderance of the evidence. On more than one occasion, however, the experienced judge stated the correct standard:

> And the bottom line on this is that because of the equivocation that he [Wade] had on that point, I can not find by a preponderance of the evidence that he did actually tell Lieutenant Johansen.

So what we have here is not the application of an incorrect burden of proof, but rather the classic case of a tie resulting in a win for the party who does not bear the burden. The judgment of the district court, for these reasons, is AFFIRMED.